UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Cynthia Metivier,

                        Plaintiff,

v.

David Bernhardt,[1] Secretary, United States
Department of the Interior,

                        Defendant.

File No. 17-cv-2017 (ECT/DTS)

**OPINION AND ORDER**

---

Cynthia Metivier, pro se.

Ana H. Voss, United States Attorney's Office, Minneapolis, MN, for Defendant David
Bernhardt.

---

      Plaintiff Cynthia Metivier worked for the U.S. Department of the Interior (the
"Department") for nearly twelve years before her employment was terminated in July 2014
after budget shortfalls within the federal government. In this case, she brings claims for:
(1) sex discrimination; (2) reprisal or retaliation; and (3) creation of a hostile work
environment, all in violation of Title VII of the Civil Rights Acts of 1964 and 1991,
42 U.S.C. § 2000e, *et seq.*; and (4) violations of the Whistleblower Protection Act of 1989
("WPA") and the Whistleblower Protection Enhancement Act of 2012 ("WPREA"),
5 U.S.C. §§ 2301(b), 2302(b)(1), (b)(4), and (b)(8), (b)(9), (b)(13), 2302(a)(2)(a); Pub. L.

---

[1]     Secretary of the Interior David Bernhardt is substituted for former Secretary of the
Interior Ryan K. Zinke because a "[public] officer's successor is automatically substituted
as a party" and "[l]ater proceedings should be in the substituted party's name." Fed. R.
Civ. P. 25(d).

No. 112-199, 126 Stat. 1465. Am. Compl. ¶ 7 [ECF No. 34]. Defendant David Bernhardt, the Secretary of the Department, moves for summary judgment on all of Metivier's claims, ECF No. 51, and that motion will be granted. Though Metivier asserts many facts in support of her several legal claims, she has failed as a matter of law to identify evidence supporting essential elements with respect to each of her claims.

I[2]

Metivier was employed by the Department in a variety of roles for nearly 12 years until her employment was terminated, effective July 22, 2014. Metivier Decl. ¶ 2 [ECF No. 67]; Metivier Dep. Ex. 18 at 1 [ECF No. 55-18]. The period of that employment most salient to these proceedings ran from June 2011 through July 2014, when she was a level G-15 Attorney Advisor with the Department's Office of Hearings and Appeals ("OHA"). Metivier Dep. Ex. 8 [ECF No. 55-8]. In that position, she administered cases involving the White Earth Land Reservation Settlement Act ("WELSA"), Pub. L. 99-264, March 24, 1986, 100 Stat. 61. Metivier Dep. 30-32 [ECF No. 55]. Accordingly, Metivier's workplace in Bloomington, Minnesota will be referred to as the "WELSA division." Metivier joined the WELSA division in February 2010. Metivier Dep. at 35.

A

From March 2010 until January 2013, Metivier's direct supervisor in the WELSA division was Janet Goodwin, Principal Deputy to the OHA Director. Goodwin Decl. ¶ 3

---

[2]    In describing the relevant facts and resolving this motion under Rule 56(a), all of Metivier's evidence is believed, and all justifiable inferences are drawn in her favor. *See Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

[ECF No. 56].  In January 2013, Goodwin became Acting Director of OHA; she was named Director in September 2013.  *Id.* ¶¶ 2-3.  In those roles, she was Metivier's second-line supervisor, and Hope Mentore-Smith, who succeeded Goodwin as Principal Deputy Director, was Metivier's direct supervisor until the end of Metivier's employment.  *Id.* ¶ 3. Even after Goodwin's change in title, however, she continued to directly oversee Metivier's work in at least some respects.  Metivier Dep. at 206–07.  Throughout the relevant time, Goodwin was based in Arlington, Virginia, and she, and later apparently also Mentore-Smith, supervised the WELSA division remotely.  *Id.* at 117.

The WELSA division was a small office; Metivier never supervised more than two staff members at a time.  *Id.* at 34.  When Metivier joined WELSA, she supervised a staff of one, a paralegal named Pam Meinen.  *Id.* at 34, 44.  At some point, she hired a legal assistant, Greig Dahlke.  *Id.* at 48.  Later, Meinen was replaced as the WELSA division's paralegal by Cheryl Schwartz.  *Id.* at 46, 48, 75.  At some point after Schwartz came on board, Dahlke left, and for about one year, Schwartz and Metivier were the only employees in the WELSA division until Melody Negron joined the office as a legal assistant.  *Id.* at 75.  Metivier conducted the regular performance ratings for at least Dahlke and Schwartz, and Goodwin reviewed those ratings as Metivier's supervisor.  *Id.* at 51.

B

In late 2009, before joining the WELSA division, and while working under a different supervisor and in a different role within the Department, Metivier had initiated an Equal Employment Opportunity ("EEO") complaint alleging sex discrimination by her then-supervisor, administrative law judge Richard Hough.  Metivier Decl. ¶ 4.  It was the

first time Metivier had ever filed a complaint against a supervisor. *Id.* The details of that complaint are not directly relevant to this case, but to some extent that EEO proceeding casts a shadow over this one. Ultimately, her 2009 EEO complaint was resolved through a settlement with the Department on June 3, 2011. *Id.* Metivier did not seek or receive any money as a part of the settlement. Metivier Dep. at 148. As part of the settlement agreement, the Department agreed to convert Metivier from a term employee (a temporary employment status) to a permanent one, with a duty station in the Twin Cities metropolitan area, where she had purchased a home. *Id.* at 149–50; Metivier Dep. Ex. 7 at 2 [ECF No. 55-7]. Metivier's sole goal in the EEO proceeding was "to be able to do [her] job without being harassed." Metivier Dep. at 150. Goodwin was not involved in that EEO complaint, and only learned about it when she became Principal Deputy Director. Goodwin Decl. ¶ 6.

At some point in 2011, the WELSA division had to be relocated from the Whipple Federal Building in Bloomington, Minnesota while that building was renovated. *Id.* ¶ 7. Goodwin and Metivier toured potential office space together. *Id.* During that tour, Goodwin stated that she "did not think it was financially advantageous for OHA to spend money for a new WELSA office when there was space available in other OHA offices under existing leases." *Id.* Metivier believes that this sentiment "was in defiance of the terms of the settlement agreement." Metivier Br. at 5 [ECF No. 65]. Notwithstanding Goodwin's opinion, however, she did ensure that the WELSA division secured an office lease "in new and appropriate space." Goodwin Decl. ¶ 7. Metivier contends that Goodwin initially did not want to provide the WELSA division with adequate office equipment, such

as a reception desk, until Goodwin's supervisor intervened and eventually that equipment was provided. Metivier Decl. ¶ 7. Metivier also alleges that the telephone system never worked properly in the Bloomington office location, and that Goodwin did not ensure that it was fixed promptly. *Id.* ¶ 7.

C

Metivier's work in the WELSA division generally was of high quality. For Metivier's performance appraisals for fiscal years 2010 through 2013, Goodwin served as Metivier's rater. Metivier Dep. at 117–19 (2012), 130–31 (2010 and 2011), 137 (2013). The categories in which Metivier was rated were consistent over that time period: her strategic management of human capital (Critical Element 1), the number of non-probate cases concluded (Critical Element 2), the quality of her analysis and writing in her decisions (Critical Element 3), and a summary rating calculated based on her rating for each of the three critical elements. *See generally* Metivier Dep. Exs. 2, 4–6 [ECF Nos. 55-2, 4–6]. In each of Metivier's four annual reviews, Goodwin gave Metivier the highest possible rating of "Exceptional" on critical elements 2 and 3, relating to the quantity and quality of her work product. *See id.* And in the 2010, 2011, and 2013 reviews, Goodwin rated Metivier as either "Fully Successful" or "Superior" on critical element 1, relating to her supervisory and managerial duties. Metivier Dep. Exs. 4–6. Those ratings correspond to the third and fourth highest of the five available ratings. *Id.* Based on the ratings in those categories, Goodwin calculated Metivier's summary ratings either "Superior" or "Exceptional" for 2010, 2011, and 2013—the two highest summary ratings possible. *Id.*

But Metivier's 2012 rating for personnel management, and consequently her summary rating, were anomalously low. *See generally* Metivier Dep. Ex. 2. The reason Goodwin rated Metivier poorly that year relates to circumstances surrounding the abrupt resignation of the WELSA division's paralegal, Cheryl Schwartz, in September 2012. Goodwin Decl. ¶ 9. In mid- to late September 2012, Goodwin received a phone call from Schwartz. *Id.* ¶ 10. Schwartz was very upset and told Goodwin that she was being harassed and verbally abused by Metivier.[3] *Id.* Goodwin asked Schwartz to describe her allegations in an email and to include as many details as possible. *Id.* Schwartz did so on September 18, 2012.[4] Goodwin Decl. Ex. 22 [ECF No. 56-1]. Schwartz and Goodwin

_____

[3] Metivier has asked the Court to "strike" Goodwin's declaration "as it is not made on personal knowledge, it does not set out facts that are admissible in evidence, and [Goodwin] is not competent to testify on the truth of the matters contained in her declaration." Metivier Br. at 18–19. Goodwin's declaration properly may be considered in connection with summary judgment because it was made on personal knowledge and under penalty of perjury. Goodwin Decl. at 1, 12. Insofar as Goodwin's declaration relays what she was told by Schwartz or others, that testimony is not being offered to prove the truth of the matter asserted—the allegations that Metivier did indeed harass and verbally abuse Schwartz, for example—but as evidence of what Goodwin was being told in the course of her work supervising Metivier and overseeing the WELSA division—information which she then investigated and weighed in completing Metivier's annual performance review and imposing any additional discipline. Goodwin's testimony is offered, and admissible, for that purpose. Metivier has offered no countervailing evidence—for example, testimonial or other evidence showing that Goodwin never spoke to Schwartz about Metivier's workplace behavior, or that Goodwin has falsely characterized what Schwartz communicated to her.

[4] Metivier has asked the Court to "strike" the "alleged unsworn and unsupported statements/emails of Cheryl Schwartz and Greig Dahlke [which Goodwin obtained as her investigation of Schwartz's complaint progressed] from the record as they are inadmissible hearsay evidence that are being used by [. . .] Goodwin[] for the intended purpose of proving the truth of the matter asserted." Metivier Br. at 18. As with Goodwin's own declaration, the statements and emails from Schwartz and Dahlke show what Goodwin was

6

traded emails over the next few days, with Goodwin requesting more information and Schwartz responding. *Id.* Midway through the work day on September 20, 2012, Schwartz walked out and resigned, effective immediately. Metivier Dep. at 84–85. Metivier was shocked. *Id.* She asked Negron if she knew why Schwartz had walked out, and Negron, looking uncomfortable, suggested that Metivier should talk to Goodwin. *Id.* at 87. Metivier called Goodwin immediately to ask what was going on, but Goodwin responded "curtly" that she was not yet ready to talk about it. *Id.* at 87–88; Metivier Decl. ¶ 11.

Meanwhile, Goodwin asked the Department's Solicitor General's Office for advice on how to proceed, and she was told to investigate Schwartz's report. Goodwin Decl. ¶ 11. In doing so, she spoke to Dahlke, who submitted a written statement. Goodwin Decl. Ex. 23 [ECF No. 56-2]. In some respects, Dahlke's statement corroborated Schwartz's allegations—for example, he reported that in his opinion, Metivier was at times "abusive" to Schwartz, mainly when Schwartz made errors in her work, and that he had observed Schwartz leaving the office in tears after Metivier had berated her for making a mistake during a training. *Id.* at 5. He also stated that Schwartz had a "moderately poor work performance," consistently made errors in drafting decisions—some of which were caught by Dahlke or Metivier before the decisions were issued, and some of which were not, which meant the decisions included errors when they were issued—and that Schwartz did not take feedback well. *Id.* at 2.

---

being told in the course of her work supervising Metivier and overseeing the WELSA division, and at the very least they are admissible for that purpose.

Goodwin also spoke directly with Metivier in investigating Schwartz's allegations. Goodwin Decl. ¶ 12. Metivier denied engaging in harassing, abusive, or otherwise inappropriate conduct toward Schwartz. Metivier Decl. ¶¶ 13–16. In a series of conversations on September 20 and 21—the day Schwartz quit and the day following—Goodwin continued to press Metivier as to why Schwartz would suddenly quit if her allegations about Metivier's conduct were not true; Metivier responded that she did not know why, but she continued to insist that the allegations were untrue. Metivier Decl. ¶¶ 12–16. Eventually, on September 21, "after hours of intense questioning," Metivier speculated to Goodwin that Schwartz may have been under stress from the lengthy period of time when the WELSA division had been understaffed (Negron had only recently joined the office, and the division had been without a legal assistant for nearly a year, ever since Dahlke's departure) and from various problems with office technology. Metivier Decl. ¶ 16; Metivier Dep. Ex. 20 at 18 [ECF No. 55-20]. Goodwin stated in her declaration that Metivier told her that Schwartz had "resigned because she was overwhelmed with frustration at her own incompetence," Goodwin Decl. ¶ 12, but Metivier seems to disagree with that characterization, allowing only that Metivier had spoken with Schwartz "regarding areas where improvement was needed," Metivier Dep. Ex. 20 at 18. Metivier explains that while Goodwin has a harsher, discipline-driven management style, Metivier's own management style is to try to work as a team to address issues "without going to the extreme." Metivier Dep. at 65. Metivier had never reported any concerns to Goodwin about Schwartz's performance, or imposed any sort of formal discipline on Schwartz for poor performance, and according to Goodwin, did not provide evidence of any attempts as

Schwartz's supervisor to address performance problems. Metivier Dep. at 56, 64, 66; Goodwin Decl. ¶ 13. Indeed, Metivier had previously given Schwartz a positive review and had recently requested that Schwartz's term appointment be renewed. Goodwin Decl. ¶ 13.

Goodwin concluded that Metivier had failed to maintain a professional relationship with Schwartz, a subordinate, and did not meet her obligations regarding the management of Schwartz's performance. *Id.* ¶ 9. As a result, on Metivier's 2012 performance evaluation, Goodwin gave Metivier the second-lowest possible rating of "Minimally Successful" with respect to her supervisory and managerial duties. *Id.*; Metivier Dep. Ex. 2. Goodwin explained that she did not find Metivier's explanations for Schwartz's departure credible, and that "[e]ven if [Schwartz] had been unable to perform her job, or had engaged in misconduct, [ ] Metivier should have addressed the issues properly in a fair and timely manner." Metivier Dep. Ex. 2 at 4. Because she had given Metivier a "Minimally Successful" rating in one of the evaluation categories, the structure of the form required Goodwin to give her a summary rating of "Minimally Successful," too. *See* Metivier Dep. Ex. 2 ("Fully Successful" summary rating based on criterion of "No Critical element rated lower than "Fully Successful"). As a result, Metivier did not receive a bonus that year, although her base pay was unaffected. Metivier Dep. at 137; Metivier Dep. Ex. 2 at 1. Metivier requested that Goodwin reconsider her 2012 performance review, but Goodwin declined. Goodwin Decl. ¶ 14; Metivier Decl. Exs. F, G [ECF No. 67-1 at 20, 24]. In late January 2013, Metivier again sought reconsideration of her 2012 performance review, Metivier Decl. Ex. I [ECF No. 67-1 at 79], but John Ross, Director of Valuation

Services—a separate division of the Department to which Metivier directed her request—denied the request on February 11, 2013, Metivier Dep. Ex. 3 [ECF No. 55-3]. Ross did not find evidence to support Metivier's request. *Id.*

D

On February 4, 2013, Metivier filed an informal grievance on a number of issues, including the 2012 performance review as well as various complaints about the WELSA division's office technology and Goodwin's interpersonal demeanor and alleged management deficiencies. *See* Metivier Decl. Ex. J [ECF No. 67-1 at 83]. The facts she alleged relating to those complaints make no reference to issues relating to sex-based discrimination. *See generally id.* The only arguable reference the grievance made to sex-based discrimination appears among the various types of relief Metivier sought through the informal grievance. Specifically, she requested that her "Direct Supervisor show respect generally afforded to judges and supervisors *regardless of gender*, including but not limited to," among other things, "[r]efer[ring] to [Metivier] by my official title as 'Administrative Judge' when addressing subordinates or clients so as to avoid *disparate treatment based on gender*." *Id.* at 4 (emphasis added).

On February 19, 2013, a number of Metivier's grievances and requested relief were rejected as insufficiently detailed, untimely, or outside the scope of the grievance procedures. Metivier Dep. Ex. 10 [ECF No. 55-10]. With respect to Metivier's gender-related complaints, the responding official stated that she "did not find evidence to show that Ms. Goodwin is undermining your authority" and "did not find evidence of disparate treatment based on gender" with respect to the use of professional titles. *Id.* at 2.

Additionally, the reviewing official "noted that your [Metivier's] official title is Attorney-Advisor," not Administrative Judge, though the reviewing official did recommend to Goodwin that "she ensure there is no disparate treatment in established internal office communication." *Id.* at 2–3.

E

Shortly after Metivier's 2012 performance review, on January 11, 2013, Goodwin proposed suspending Metivier for three days without pay for conduct unbecoming a supervisor. Goodwin Decl. ¶ 16; Metivier Dep. Ex. 1 [ECF No. 55-1]. The proposed suspension was based in substantial part on the circumstances surrounding Schwartz's departure, but also alleged that Metivier had made "unsubstantiated" statements tending to damage the reputation of both WELSA division's legal assistant and OHA's information-technology ("IT") specialist, and had engaged in uncooperative and discourteous treatment of OHA's IT specialist, which Goodwin had personally witnessed. *See generally* Metivier Dep. Ex. 1. Goodwin stated in her declaration that the proposed discipline was not based on Metivier's gender or prior protected activity. Goodwin Decl. ¶ 18. The proposed discipline could not be implemented unless and until it was approved by the Office of the Secretary. *Id.* ¶ 16. Metivier sought review of the proposed discipline on January 21, 2013, but ultimately it was approved on March 14, 2013. *Id.* ¶ 17; Metivier Dep. Ex. 11 at 1 [ECF No. 55-11].

F

On February 27, 2013—shortly after Metivier's informal grievance alleging, among other things, disparate treatment in the respect and use of professional titles accorded to

men and women was resolved, and while the proposed three-day suspension was under consideration, but before it was approved—Metivier contacted EEO. Am. Compl. ¶ 23; Metivier Dep. at 173. The Parties do not describe the substance of that February 2013 communication, but they seem to agree it alleged that Metivier was subjected to some form of sex-based discrimination or reprisal.

G

In this lawsuit, Metivier takes issue with a number of changes that occurred in the WELSA division in the months following Schwartz's departure.

First, in late January 2013, Goodwin instituted weekly calls with the Principal Deputy Director, Metivier, and Metivier's support staff. Goodwin Decl. ¶ 19; Metivier Decl. Ex. U [ECF No. 67-1 at 146] (stating that Goodwin announced on January 30, 2013 that she would implement weekly calls). Goodwin and the Principal Deputy Director had weekly status calls with OHA's other organization units at that time, as well. Goodwin Decl. ¶ 19. Metivier takes issue with the weekly check-in calls, though, on the basis that they began after Metivier's three-day suspension and because Goodwin had never before required any other office—including the WELSA division, which was run by a man before Metivier assumed the role in 2010—to have weekly calls. Metivier Dep. at 176.

Second, after Schwartz quit in September 2012, her position was not filled, and Metivier did not have a paralegal on staff for the rest of her time in the WELSA division. Metivier Dep. at 94; Metivier Decl. ¶ 10. Schwartz's departure coincided with preparations for a possible sequester in the event that Congress was unable to pass a budget. Goodwin Decl. ¶ 29. Managers within the Department were warned of the possibility of a sequester

in 2012, and in February 2013, the Secretary formally announced the sequester and implemented a hiring freeze. *Id.* ¶¶ 29–30; Goodwin Decl. Ex. 24 [ECF No. 56-3]. Under the hiring freeze, vacancies were not to be filled unless offers had already been made to prospective employees by the personnel office. Goodwin Decl. ¶ 30; *see also* Goodwin Decl. Ex. 24. At some point before Director Bob More left his position on January 3, 2019 and Goodwin succeeded him as Acting Director, More had authorized Metivier to hire a replacement paralegal, and Metivier had interviewed candidates for the position but, according to Goodwin, "the process had not been completed and no offers had been extended." Goodwin Decl. ¶ 31; Metivier Decl. ¶ 34. Metivier says she had interviewed and made an offer to a particular candidate, *see* Metivier Decl. ¶ 34, but points to no evidence that the personnel office had extended an offer to that candidate or been informed that Metivier had done so on her own. Although it was possible to seek an exception to the hiring freeze in some circumstances, Goodwin determined that it would be inappropriate to do so with respect to hiring a replacement for Schwartz because seeking an exception would require Goodwin to "sign a certification that the work previously performed by [Schwartz] could not be adequately performed elsewhere in OHA by existing employees"—a statement that Goodwin believed would be untrue. Goodwin Decl. ¶ 33.

Third, to try to accommodate the reduced staffing in the WELSA division following the hiring freeze, Goodwin began the process of reassigning some of the WELSA caseload to another division of OHA located in Salt Lake City, Utah. *Id.* ¶ 34. Goodwin determined that having the team in Salt Lake City support the WELSA division would reduce Metivier's workload to a level that could be managed even without a paralegal on staff. *Id.*

¶¶ 32, 34. Goodwin informed Metivier of that decision by phone on April 16 and by email the following day. *Id.* ¶ 34; Goodwin Decl. Ex. 25 [ECF No. 56-4].

Fourth, Metivier believes that the manner in which cases were reassigned to Salt Lake City resulted in the WELSA division keeping the older, more challenging cases that had already lingered for a while, while Salt Lake City received newer cases that had a higher proportion of easier cases that were quicker to resolve. Metivier Dep. at 104–06.

Fifth, Metivier seems to consider the reassignment of cases to Salt Lake City a breach of her 2011 settlement agreement reached in her first EEO complaint. *See* Metivier Decl. Ex. O [ECF No. 67-1 at 131].

Sixth, in a May 30 phone call among Goodwin, Metivier, and Mentore-Smith, Goodwin also told Metivier she would need to train the Salt Lake City staff on the WELSA work. Metivier Dep. at 179. Metivier says this additional duty made it more difficult for her to perform her regular work. *Id.* at 106, 180–81.

Seventh, in that same May 30 conversation, Goodwin told Metivier that the paralegal vacancy in the WELSA division would not be filled; that news then prompted Negron, Metivier's legal assistant, to tender her resignation on June 3, 2013. *Id.* at 177–78. On June 6, 2013, Goodwin informed Metivier that Negron's position would not be filled in light of the hiring freeze and an instruction from the budget office (discussed in more depth below) that OHA would need to eliminate a number of full-time positions; Negron's duties would be absorbed by administrative staff in Salt Lake City. *Id.* at 178; Metivier Dep. Ex. 12 [ECF No. 55-12]; Goodwin Decl. ¶ 38. Metivier recounts that Goodwin became "very defensive" and disrespectful during that conversation and began

14

yelling at Metivier. Metivier Dep. at 180–81. Metivier began to hyperventilate and shake, and had difficulty speaking, and told Goodwin she had to get off the phone. *Id.* at 181–82. She does not seem to dispute Goodwin's account that Metivier was very upset during that call and hung up on Goodwin, *see* Goodwin Decl. ¶ 23, though she says she politely terminated the call out of concerns for her own health and well-being, Metivier Dep. at 182. Following the call, Metivier sought medical attention at urgent care. Metivier Dep. at 183.

H

After Metivier hung up on Goodwin and Mentore-Smith, Goodwin attempted to call Metivier back, to no answer. Goodwin Decl. ¶ 24. Goodwin then contacted Negron and asked her to have Metivier call Goodwin, but Goodwin again did not hear from Metivier. *Id.* The following day, a Friday, Goodwin emailed Metivier a recap of their conversation as well as relaying several pieces of information they had not discussed before Metivier terminated the call. *See id.* ¶ 25; Metivier Dep. Ex. 12. She sent the email to Metivier's personal account in addition to her work account because Metivier was out sick and was scheduled to telework on Monday; Metivier had previously reported that she sometimes had difficulty accessing her work account from home, and Goodwin had arranged for Metivier to conduct training with certain Salt Lake City staff via teleconference on Monday morning. Metivier Dep. Ex. 12.

On July 11, 2013, Goodwin proposed that Metivier be given a five-day suspension without pay based on her behavior during the June 6 phone call. Goodwin Decl. ¶ 26; Metivier Dep. Ex. 13 [ECF No. 55-13]. On September 26, 2013, that proposal was

adopted, and Metivier served her suspension over five non-consecutive weekend days. Goodwin Decl. ¶ 27; Metivier Dep. Ex. 14 [ECF No. 55-14]. Although Metivier initially grieved the five-day suspension, that grievance was dismissed on October 24, 2013 because she chose instead to amend her pending EEO complaint to include the five-day suspension, apparently foreclosing the availability of the Department's grievance process. Metivier Decl. Ex. P [ECF No. 67-1 at 136]; Metivier Dep. at 202.

I

On May 13, 2013, Goodwin received projections for OHA's 2013 and 2014 budget, called a "ceiling card," from the Budget Analyst for the Office of the Secretary. Goodwin Decl. ¶ 36; Goodwin Decl. Ex. 27 [ECF No. 56-6]. The ceiling card estimated that Departmental Operations, which funds the WELSA division as well as a handful of other offices, would need to cut 4 full-time equivalents ("FTEs"—jobs, essentially) for 2014, representing a loss of about $474,000 in funding. Goodwin Decl. ¶ 36; Goodwin Decl. Ex. 27.

In September 2013, as Goodwin was beginning to develop a reorganization plan to address the budget shortfalls, she reached out to Chairwoman Erma J. Vizenor of the White Earth Reservation Tribal Council, with whom she was required to consult, and proposed moving all of the WELSA work to Salt Lake City. Goodwin Decl. ¶ 39–40; Metivier Dep. Ex. 16 [ECF No. 55-16]. Subsequent correspondence from Goodwin to Vizenor reflects that Vizenor objected to moving the WELSA work out of state, but that Goodwin's attempts to schedule further discussions with Vezenor were unsuccessful. Goodwin Decl.

Ex. 28 [ECF No. 56-7]. On November 15, 2013, Goodwin informed Vizenor by letter that she intended to move the WELSA work from Bloomington to Salt Lake City. *Id.*

Accordingly, in January 2014, Goodwin drafted a memorandum for her supervisor, Andrew Jackson, Deputy Assistant Secretary—Technology, Information and Business Services, summarizing her proposal to close three of ten existing field offices (the WELSA division's office in Bloomington, as well as offices in Phoenix, Arizona and Portland, Oregon), and to eliminate four positions in those offices. Goodwin Decl. ¶ 41; Goodwin Decl. Ex. 29 [ECF No. 56-8]. In drafting the memorandum, Goodwin received input, data, and recommendations from Mentore-Smith and from Chief Administrative Law Judge Earl Waits. Goodwin Decl. ¶ 41. Jackson approved the proposal. Goodwin Decl. Ex. 29; Goodwin Decl. ¶ 41. Goodwin stated in her declaration that the decision to close the WELSA division's Bloomington office was not affected by Metivier's gender, EEO activity, performance, or discipline. Goodwin Decl. ¶ 46. The WELSA cases would be overseen by a male administrative law judge. Metivier Decl. ¶ 37.

## J

On April 2, 2014, Goodwin sent an email to all OHA employees informing them of the three office closures and that a reduction in force ("RIF") would likely be conducted among those three offices. Goodwin Decl. Ex. 30 [ECF No. 56-9]; Goodwin Decl. ¶ 42. In preparing for and conducting the RIF, Goodwin was assisted by Cynthia Piper, who had worked in various human-resources capacities for the federal government for 24 years, had participated in at least five previous RIFs during that time, and had received formal training

in the federal regulations governing RIFs. Piper Decl. ¶¶ 2–5 [ECF No. 57]; *see also generally* 5 C.F.R. Part 351.

The RIF process is described more fully in the Government's brief and in Piper's Declaration, but suffice to say, it was based on established, objective, largely quantifiable criteria. *See generally* Piper Decl. ¶¶ 8–11, 16–32. Based on Metivier's competitive area of the Minneapolis-St. Paul commuting area, *see* 5 C.F.R. § 351.402; Piper Decl. ¶ 10, and her competitive level as an Attorney Advisor, GS-15 level, see 5 C.F.R. § 351.403; Piper Decl. ¶ 11, the only other employee to whom she was compared for purposes of determining retention was Thomas Pfister, Piper Decl. ¶ 25. Piper's office calculated an adjusted service date for each—essentially, their actual years of service, as measured by a calendar, plus an adjustment for additional years of service based on the employee's average performance rating. Piper Decl. ¶¶ 20–22, 25. Metivier's adjusted service date for purposes of the RIF was March 11, 1990. Piper Decl. ¶ 21. Even if she had the highest possible average performance rating of "Exceptional," her adjusted service date would have been March 11, 1981, at the earliest. Piper Decl. ¶ 22. Pfister's adjusted service date was April 4, 1972. Piper Decl. ¶ 25. Accordingly, 5 C.F.R. § 351.601(a) required that Metivier be released before Pfister. *See* Piper Decl. ¶ 26.

In the Portland office, two employees were affected by the RIF. Piper Decl. ¶ 28. One, a woman, chose to retire rather than be separated. *Id.* Goodwin, Mentore-Smith, and Chief Administrative Law Judge Earl Waits decided to administratively reassign the second, Scott Fukumoto, a male attorney advisor, GS-14 level, from Portland to an open position in Sacramento, California. Piper Decl. ¶ 29; Waits Decl. ¶ 7 [ECF No. 58]. It was

determined that his service was critical and could not otherwise be met. Goodwin Decl. ¶ 45. At the time of the RIF, he was already serving the Sacramento office as an attorney advisor (despite his physical location in Portland) and he was the only attorney advisor in the Sacramento office or the West Coast generally. Waits Decl. ¶ 8.

In the Phoenix office, three employees were affected by the RIF. Piper Decl. ¶ 30. One, a female legal assistant, obtained a position in the Department of Homeland Security, and her RIF was canceled. *Id.* A second, a female GS-14 level attorney, was separated through the RIF. *Id.* ¶ 31. Due to her grade and position, there was no one else in the Phoenix area with whom she competed. *Id.* ¶. Her work was transferred under the reorganization to the Albuquerque office, where there was already an attorney advisor who would continue to support that office. *Id.*; Waits Decl. ¶ 10. The third, a male administrative law judge named Richard Hines, was reassigned by Goodwin, Mentore-Smith, and Administrative Law Judge Waits to the Albuquerque office. Piper Decl. ¶ 32. It was determined that his service was critical and could not otherwise be met. Goodwin Decl. ¶ 45. It was anticipated that several judges would be retiring and that caseloads would need to be shifted, so that assistance would be needed covering cases. Waits Decl. ¶ 10. Hines was covering a number of cases that could not be absorbed by the Albuquerque office. Waits Decl. ¶ 10.

In summary, 6 individuals were affected by the RIF: two men and four women. Two of the four women either retired or took jobs in other federal agencies; two of the four women (including Metivier) were separated from employment; and the two men were reassigned to other offices based on the continued need for their particular work in those

particular locations.  Goodwin denies that Metivier's selection through the RIF was affected by Metivier's gender, EEO activity, performance, or discipline.  Goodwin Decl. ¶ 46.  Certain programs to assist in employment transitions were made available to her. Piper Decl. ¶¶ 13–15.

When Metivier was separated through the RIF, she challenged that action with the Merit System Protection Board ("MSPB").  *See* Am. Compl. ¶ 38; Ans. ¶ 38 [ECF No. 37]. At that point, the sex-discrimination claims in Metivier's EEO complaint were essentially rolled into the proceedings before the MSPB.  MSPB denied her claims and affirmed the RIF.  *Metivier, Cynthia A. v. Dep't of the Interior*, No. CH-0351-14-0772-I-1, 2016 WL 1014364 (M.S.P.B. Initial Decisions Mar. 7, 2016).  Metivier appealed, and the decision below was affirmed.  *See Metivier v. Dep't of Interior*, No. CH-0351-14-0772-I-1, 2016 WL 7439649 (M.S.P.B. Dec. 21, 2016).

Metivier then commenced this action.  She alleged that she had been discriminated against on the basis of her sex, retaliated against for complaining of sex-based discrimination, and subjected to a hostile work environment, all in violation of Title VII of the Civil Rights Act, and that her workplace treatment following her complaints of Title VII violations had violated federal whistleblower statutes.  The Government moved for summary judgment on all of those claims.

## II

### A

Before the Government's summary-judgment motion can be decided, it is necessary to address certain other requests Metivier has raised in her brief.  Although she has not

filed any motion conforming to Local Rule 7.1, her brief in opposition to the Government's motion indicates that she intends her response to also serve as a cross-motion for summary judgment or, alternatively, for partial summary judgment, as well as a motion to strike certain affirmative defenses raised by the Government in its answer or in its summary-judgment briefing, and to "strike" certain evidence from consideration in connection with the Government's motion. Metivier Br. at 1, 16–19. Those requests are untimely and procedurally inadequate. Metivier's responsive brief will not be treated as also presenting valid motions for summary judgment or to strike certain evidence.

Metivier's attempt to move for summary judgment is untimely. Originally, the pretrial scheduling order required the Parties to contact chambers to schedule any dispositive-motion hearing on or before May 1, 2019, and to file motion papers forty-two days before the scheduled hearing date. Pretrial Scheduling Order ¶ 4(a) [ECF No. 36]. The Court subsequently granted the Government two extensions, first ordering that "the United States shall be granted an extension of time to file [any] Motion for Summary Judgment, up to and including May 22, 2019," [ECF No. 46] and then granting the Government until May 24, 2019 [ECF No. 50]. Metivier neither sought nor received any extension of time to file a summary-judgment motion. She did not meet the May 1 deadline, and even if the Court could conceivably construe the subsequent schedule extensions to apply to Metivier in addition to the Government, she did not meet either of those deadlines, either. She has not shown good cause, much less excusable neglect, that would justify amending the scheduling order to accommodate her late-filed purported motion. *See* Fed. R. Civ. P. 6(b)(1). And although the Court may, in appropriate

circumstances, grant summary judgment to a nonmovant, *see* Fed. R. Civ. P. 56(f)(1), this is not such a case.

Furthermore, to the extent Metivier argues that certain arguments and certain evidence the Government offers in support of its summary-judgment motion should be struck, those requests are not properly made now as motions to strike under either Rule 12(f) or Rule 56(c)(2) and (4). *See* Metivier Br. at 16–18 (seeking to strike arguments as affirmative defenses that were waived when they were not pleaded in an answer, seeking to "strike" certain evidence under Rule 56(c)(2) and (4) on the ground that it is allegedly not admissible). Most of the arguments Metivier seeks to strike are not really affirmative defenses; they are arguments that Metivier has not produced evidence sufficient to permit a reasonable jury to find that she has established the elements of her claims. *See generally id.* As such, the Government may properly raise those arguments in support of summary judgment, regardless of whether or how they were pleaded in the Government's answer. With respect to the Government's argument that Metivier failed to exhaust her whistleblower claims, however, Metivier is correct that the Government never pleaded that particular affirmative defense. *See generally* Ans. at Affirmative Defenses ¶¶ 1–6 [ECF No. 37]. Therefore, that defense is waived. *See Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849 (2019) ("[A]n objection based on a mandatory claim-processing rule may be forfeited if the party asserting the rule waits too long to raise the point." (quotation omitted)).

B

In addition to the briefing permitted under Local Rule 7.1(c), Metivier has filed a surreply without prior authorization of the Court, in violation of Local Rule 7.1(i). ECF

No. 70; *see* LR 7.1(i) ("Except with the court's prior permission, a party must not file a memorandum of law except as expressly allowed under LR 7.1."). The Local Rules also do not contemplate the filing of a separate document responding to the moving party's statement of facts, but Metivier has done so here. ECF No. 66. As a result of these three combined documents, she is considerably over her limit of 12,000 words to respond to the Government's motion, although it is impossible to tell exactly how many additional words she has used. In considering what to do with the unauthorized filings, the Court is mindful of the fact that Metivier, though appearing pro se in this case, is an experienced attorney.

The Government asks that Metivier's standalone response to the Government's statement of undisputed facts be disregarded. *See* Govt Reply at 3 n.2 [ECF No. 69]. That 19-page filing, captioned "Plaintiff's Response to Defendant's Statement of Undisputed Material Facts," is mostly a narrative of factual assertions and denials, not made under oath or under penalty of perjury and only very occasionally referencing documents in the record. Because the filing is not authorized under Local Rule 7.1, and because it furthermore does not enhance understanding of Metivier's summary-judgment arguments, it will not be considered in resolving the Government's motion. There is no justification to consider Metivier's unauthorized surreply, either. The Court has reviewed its contents nonetheless, but that filing has no impact on the outcome of this motion.

III

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute over a fact is "material" only if its resolution "might affect

the outcome of the suit" under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute over a fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 651 (2014).

A

In Count I, Metivier alleges that she endured discrimination based on her sex, which is illegal under Title VII.  *See* Am. Compl. ¶¶ 46–61.  Specifically, Title VII prohibits employers from, among other things, "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  Because Metivier points to no direct evidence of sex discrimination,[5] her claim must be analyzed under the *McDonnell Douglas* burden-shifting framework.  *See Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1045–46 (8th Cir. 2005); *see generally McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

---

[5]     Direct evidence of discrimination entails "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." *Russell v. City of Kansas City, Mo.*, 414 F.3d 863, 866 (8th Cir. 2005) (quotation omitted).  It includes "comments or statements indicating discriminatory intent, where those comments are made by people with decision-making authority." *Hutton v. Maynard*, 812 F.3d 679, 683 (8th Cir. 2016).  In the context of a discrimination claim, whether evidence of discrimination is direct or indirect depends on "the causal strength of the proof, not whether it is 'circumstantial' evidence." *Lors v. Dean*, 746 F.3d 857, 865 (8th Cir. 2014) (quotation omitted).  Metivier has no such evidence.  Temporal proximity alone generally does not constitute direct evidence of discrimination, so when plaintiffs try to prove discrimination claims based on temporal proximity they are generally analyzed under *McDonnell Douglas*. *See, e.g.*, *Eriksson v. Deer River Healthcare Ctr., Inc.*, 15 F. Supp. 3d 919, 925 (D. Minn. 2014).

To establish a prima facie case of sex discrimination under *McDonnell Douglas*, Metivier must show that: (1) she is a member of a protected group; (2) she is qualified, which in this context means that she is performing her job at a level that meets her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802; *Kratzer*, 398 F.3d at 1046–47 (citing *Whitley v. Peer Review Sys., Inc.*, 221 F.3d 1053, 1055 (8th Cir. 2000). If the plaintiff establishes a prima facie case, the defendant bears the "non-onerous" burden of production to offer a legitimate non-discriminatory reason for the adverse employment action. *Montes v. Greater Twin Cities Youth Symphonies*, 540 F.3d 852, 858 (8th Cir. 2008) (quotation and citations omitted). If the defendant does so, the burden of proof then shifts back to the plaintiff to show the employer's non-discriminatory reason for the employment action was a pretext for unlawful discrimination. *Id.* At all times, the burden of proving that the employer's conduct was because of unlawful intent remains with the plaintiff. *See Torgerson v. City of Rochester*, 643 F.3d 1031, 1045-46 (8th Cir. 2011).

For purposes of its summary-judgment motion, the Government does not contest that Metivier has made the first two showings in a prima facie case; that is, they do not dispute that, as a woman, she is a member of a protected class, and that she performed at least adequately in performing her job responsibilities.

1

An adverse employment action is "a tangible change in working conditions that produces a material employment disadvantage, including but not limited to, termination,

cuts in pay or benefits, and changes that affect an employee's future career prospects, as well as circumstances amounting to a constructive discharge." *Jackman v. Fifth Judicial Dist. Dep't of Corr. Servs.*, 728 F.3d 800, 804 (8th Cir. 2013). "[M]inor changes in duties or working conditions, even unpalatable or unwelcome ones, which cause no materially significant disadvantage, do not rise to the level of an adverse employment action." *Id.* A number of the events Metivier points to are—or at least, are arguably—adverse employment actions, but others plainly are not.

Some of Metivier's complaints relate to things that clearly are not adverse employment actions. Goodwin's personal opinion about the wisdom of acquiring and furnishing office space for the three individuals who worked in the WELSA division does not constitute an adverse employment action; even if a failure to configure an office arrangement in a particular way could theoretically constitute an adverse employment action where the arrangement is related to an earlier sex-discrimination settlement agreement, the office was ultimately opened and furnished, if not in the way Metivier would have liked. Goodwin's decision to institute weekly check-in calls with Metivier, to transfer some of the WELSA division's work to Salt Lake City, and to require Metivier to train staff in Salt Lake City on how to do WELSA-related work certainly do not constitute adverse employment actions. *Id.* (holding that even "unpalatable or unwelcome" minor changes in duties or working conditions are not adverse employment actions if they cause no materially significant disadvantage).

By contrast, some of the things Metivier complains of plainly do rise to the level of being adverse employment actions. The termination of Metivier's employment is

undisputedly an adverse employment action.  In addition, Metivier's three-day suspension imposed in March 2013 and her five-day suspension imposed in September 2013 were both served without pay, and therefore constitute adverse employment actions.[6]  *See* Metivier Dep. Ex. 11 (decision to impose 3-day suspension without pay); Metivier Dep. Ex. 14 (decision to impose 5-day suspension without pay).

Furthermore, the Court will assume without deciding that the remaining events— the fact that the WELSA division was, for a time, without a paralegal, and later without a paralegal or a legal assistant; Metivier's 2012 performance review (which may have foreclosed her eligibility for a bonus that year); and Goodwin's investigation of Schwartz's allegations against Metivier (as distinct from the consequences imposed as a result of the investigation)—constitute adverse employment actions.  The record on those discrete events and their effect on the conditions of Metivier's employment is too inconclusive to permit a ruling on whether any of them produced a material employment disadvantage within the meaning of *Jackman*.  728 F.3d at 804.

---

[6]     The Government suggests that because Metivier's 5-day suspension was served over a series of weekends, she did not lose pay, and that the decision therefore was not an adverse employment action.  *See* Govt. Br. at 27 [ECF No. 53].  But the decision to impose that suspension states clearly that, even though it would be served on the weekend, it would be served *without* pay, and the Government points to no evidence in the record demonstrating that the fact that it was served over a series of weekends means that Metivier's pay was not docked.  Accordingly, for purposes of this motion the Court must draw the reasonable inference that the 5-day suspension, like the 3-day suspension and the ultimate termination of Metivier's employment, constituted adverse employment actions.

The last element of a prima facie case for a discrimination claim under Title VII is that the circumstances give rise to an inference of discrimination. With respect to most of the actions with which Metivier takes issue, there is simply no evidence that they were in any way related to the fact that she is a woman. Her performance reviews from Goodwin over a period of four years are consistently positive in most areas, and Metivier has pointed to no evidence suggesting that her lower personnel-management and summary ratings in 2012 are tied to her sex. For example, Metivier points to no stray remarks suggesting discriminatory beliefs by supervisors, no gendered expectations to which she was subjected in the workplace, and no contemporaneous male colleagues who were evaluated more favorably under similar circumstances.

With respect to what Metivier characterizes as the failure to give her adequate staff to do her job, *see* Metivier Br. at 6, 8–9; Metivier Decl. ¶ 34, she has pointed to no evidence suggesting that her sex played any role in Goodwin's decision not to fill the WELSA division's paralegal and legal assistant positions that became vacant before or during the onset of severe budgetary issues. Even if all of Metivier's male counterparts in other offices had paralegals at that time, *see* Metivier Decl. ¶ 34, Metivier has identified none who were similarly situated to her. For example, she has not pointed to any male counterparts who were permitted to fill vacant paralegal positions despite the impending possibility of a sequester, as opposed to simply being permitted to continue employing longtime staff until the budgetary picture resolved. Instead, she points to the fact that other individuals were hired or promoted during the same time, but the hiring of three Indian

Probate Judges and the promotion of Mentore-Smith, *see* Metivier Decl. ¶ 34 and Exs. L, EE at 254–55, do not say anything about the staffing in Metivier's office when compared to her male counterparts.

In short, Metivier was clearly unhappy about many aspects of her workplace and Goodwin's management, but Title VII does not prohibit disparate treatment on the basis of job performance, erroneous evaluations, personality conflicts, or unwise business decisions, and there is no evidence that most of the adverse actions Metivier challenges were anything but. *Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1108–09 (8th Cir. 1998).

The only possible exception to that conclusion is the OHA reorganization and subsequent termination of her employment. There, Metivier points to the fact that both men affected by the RIF were reassigned to other positions while the two employees who were separated were women.[7] Accordingly, insofar as Metivier's sex-discrimination claim is based on anything other than OHA's reorganization and RIF, it fails for lack of evidence that Metivier's treatment was the result of her employer's unlawful intent. The remainder of the burden-shifting framework will be analyzed below only with respect to the reorganization and RIF.

---

[7]    Even this bare difference may not be enough under the law. The Eighth Circuit has held that, in the context of a RIF, statistical evidence about whose positions were eliminated is "meaningless" for purposes of establishing a prima facie case without some analysis of the demographics of the entire workforce before and after the RIF. *See Ward v. Int'l Paper Co.*, 509 F.3d 457, 461–62 (8th Cir. 2007) (quoting *Chambers v. Metro. Prop. & Cas. Ins. Co.*, 351 F.3d 848, 856 (8th Cir. 2003)). But the Government has not raised that argument, and the summary-judgment motion will not be decided on that basis.

The Eighth Circuit has concluded that, in general, a RIF undertaken pursuant to a reorganization or to address budgetary issues constitutes a legitimate, nondiscriminatory reason for terminating employment. *See, e.g.*, *Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) ("Having determined that Wells failed to present a prima facie case of discrimination, we need not analyze SCI's proffered legitimate, nondiscriminatory reason for the discharge, although we note a RIF certainly constitutes such a reason"); *Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 838 (concluding company implementing RIF pursuant to reorganization "need not provide evidence of financial distress to make a RIF "legitimate" (quotation omitted)). The Court does "not sit as a super-personnel department to review the wisdom or fairness of [an employer's] job-elimination policies during the RIF." *Wallace v. Sparks Health Sys.*, 415 F.3d 853, 860 (8th Cir. 2005).

It is absolutely clear that the OHA, like the Department as a whole and indeed the entire federal government, faced a significant financial challenge as a result of the budget sequestration that began on March 1, 2013. 2 U.S.C. § 901a(5). To cope, a Department-wide hiring freeze was implemented, and agency heads, including Goodwin, were required to implement fairly drastic cost-saving measures. Goodwin Decl. Exs. 24, 26. Within OHA, Goodwin had to cut four full-time positions and achieve a cost savings of $474,000. Goodwin Decl. ¶ 36. In an attempt to meet those financial requirements while continuing to serve the agency's mission, Goodwin proposed, and higher-ups approved, a reorganization that would close three offices around the country: Metivier's office in Bloomington, as well as offices in Portland and Phoenix. Goodwin Decl. ¶¶ 37-41, Ex. 29.

It is that context in which the RIF was implemented. Metivier has introduced no evidence that her office was selected for closure because she was a woman.

Furthermore, the Government has made a sufficient showing that the manner in which it selected positions for the RIF was not related to sex, but instead was based on legitimate, nondiscriminatory criteria, in a manner consistent with the federal regulatory scheme governing those decisions, and that the reassignment of two affected employees to other offices was made based on the legitimate, nondiscriminatory determination that, unlike Metivier, their work could not be absorbed by other employees. To the extent Metivier contends that the reorganization and RIF were deficient—for example, because Goodwin was only an acting director when the process was begun, or because OHA's consultation with the White Earth tribal leadership was lacking in some way—those alleged deficiencies have no bearing on the fact that the decision, imperfect as she believes it to be, was made for reasons that were legitimate and not discriminatory. Metivier has offered no evidence of pretext that would overcome the Government's evidence of its own legitimate motive with respect to the reorganization and RIF.

For these reasons, the Government is entitled to summary judgment on Metivier's sex-discrimination claim.

## B

In Count 3, Metivier alleges that she was subjected to a hostile work environment on account of her sex, in violation of Title VII. *See* Am. Compl. ¶¶ 84–95. To establish a prima facie case on her claim of a hostile work environment, Metivier must show: (1) she belongs to a protected group; (2) she was subject to unwelcome harassment; (3) a causal

nexus exists between the harassment and the protected-group status; (4) the harassment affected a term, condition, or privilege of employment; and (5) her employer knew or should have known of the harassment and failed to take proper action. *Sallis v. Univ. of Minn.*, 408 F.3d 470, 476 (8th Cir. 2005) (citing *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004)). To be actionable, the work environment must be both objectively hostile to a reasonable person and subjectively hostile to the victim. *Id.* (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)). To show an objectively hostile work environment, "the harassment must be severe or pervasive." *Duncan v. Cty. of Dakota*, 687 F.3d 955, 960 (8th Cir. 2012) (citing *Kratzer*, 398 F.3d at 1047). Metivier must show that "the workplace is permeated with discriminatory intimidation, ridicule, and insult," *Sutherland v. Missouri Dep't of Corr.*, 580 F.3d 748, 751 (8th Cir. 2009) (quotation omitted), and that it is "extreme in nature and not merely rude or unpleasant." *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006). In assessing the complained-of conduct, courts consider factors including the frequency and severity of the allegedly discriminatory conduct, whether it is physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *Sallis*, 408 F.3d at 476 (citing *Elmahdi v. Marriott Hotel Servs., Inc.*, 339 F.3d 645, 653 (8th Cir. 2003) and *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 934 (8th Cir. 2002)).

As described above, Metivier has introduced no evidence of a causal connection between the fact that Metivier is a woman and the investigation of Schwartz's allegations and the consequent low performance evaluation, Metivier's two suspensions, Goodwin's

refusal to fill vacant paralegal and legal-assistant positions during a budget crunch, the OHA reorganization, or the RIF. Therefore, Metivier's hostile-work-environment claim seems to encompass, at most: (1) Goodwin's one-time statement that she did not think renting office space for WELSA was a good use of funds when other options for office space were available; (2) Goodwin's implementation of weekly calls with Metivier to monitor the WELSA division; (3) reassigning some portion of Goodwin's caseload to the Salt Lake City office when Metivier's office became understaffed as employees left during the hiring freeze; (4) the method by which the WELSA division's cases were selected for reassignment to Salt lake City; (5) Goodwin's instruction that Metivier must train the Salt Lake City staff on how to handle the reassigned work; (6) Goodwin's general rudeness and hostility toward Metivier. Taken together, this conduct does not present a work environment that would be objectively hostile to a reasonable person. Moreover, no reasonable jury could conclude that any of it was related to the fact that Metivier is a woman. Metivier has not produced evidence sufficient to make out a prima facie case of a hostile work environment, and therefore the Government is entitled to summary judgment on Count 3.

## C

In Count 2, Metivier alleges that she was subjected to unlawful retaliation, in violation of Title VII. *See* Am. Compl. ¶¶ 62–83. Title VII makes it unlawful for "an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has

made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

Because Metivier has introduced no direct evidence of unlawful retaliation, her claim must be analyzed under the McDonnell Douglas framework. *See Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1021 (8th Cir. 2011). Accordingly, to establish a prima facie case on her retaliation claim, she must show that: (1) she engaged in protected conduct; (2) she suffered a materially adverse employment action; and (3) a causal connection existed between the protected conduct and the adverse employment action. *Guimaraes v. SuperValu, Inc.*, 674 F.3d 962,978 (8th Cir. 2012); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

As described above, the only events that could arguably rise to the level of a materially adverse employment action are: (1) the September 2012 investigation of Schultz's allegations that Metivier had harassed and abused her and the resulting low rating in her 2012 performance review; (2) Metivier's 3-day suspension, proposed in January 2013 and approved on March 14, 2013; (3) her 5-day suspension, proposed on July 11, 2013 and issued on September 26, 2013; (4) Goodwin's refusal to fill the vacant paralegal and legal-assistant positions; (5) the OHA reorganization; and (6) the RIF.

Although Metivier's first EEO complaint, made in 2009 and resolved in June 2011, undisputedly constitutes protected activity, it is too far removed in time from even the earliest of those adverse employment actions to support a finding of a causal connection between the two, and no other evidence of a causal connection exists. *EEOC v. Prod.*

*Fabricators, Inc.*, 763 F.3d at 963, 973 (8th Cir. 2014) (concluding protected activity a year prior to termination does not support finding of causation).

In the months and years following the resolution of that first EEO complaint, Metivier periodically clashed with Goodwin and made a number of complaints up the chain of command about her workplace circumstances, but most of that communication concerned run-of-the-mill workplace strife. No evidence suggests that Metivier undertook any of it out based on a "good faith, reasonable belief that the underlying challenged conduct violated Title VII," as opposed to simply disagreeing with Goodwin's management actions. *Brannum v. Missouri Dep't of Corrs.*, 518 F.3d 542, 547 (8th Cir. 2008) (quotations omitted). If she was not complaining of (or understood to be complaining of) Title VII violations, then she could not have been retaliated against for complaining of Title VII violations, and those complaints therefore cannot give rise to a retaliation claim.

The next time Metivier mentioned anything to her employer relating in any way to disparate treatment was her informal grievance, filed February 4, 2013, in which she made a passing reference to Goodwin's failure to address Metivier with Metivier's preferred professional title, while addressing male counterparts by their preferred professional titles. *See* Metivier Decl. Ex. J. The Government does not directly address this informal grievance, but even if the Court assumes without deciding that the February 2013 grievance was based on Metivier's good faith, reasonable belief that Goodwin's use (or non-use) of certain professional titles in the workplace violated Title VII, such that the grievance was sufficient under *Brannum*, there is no hint in the response Metivier received to her informal

grievance that her employer understood Metivier's statements as protected activity. That response addresses Metivier's complaint regarding professional titles only briefly, notes that the Department found no evidence that the alleged conduct had occurred, and sandwiched the discussion of that topic in between a number of other disparate issues, none of which appear to remotely implicate the prospect of sex discrimination.

Even if her employer had understood the grievance to be a form of protected activity, Metivier filed her grievance after her 2012 performance review and after Goodwin proposed suspending Metivier for three days, so those actions by her employers could not possibly have been taken in retaliation for a grievance that was yet to be made. Furthermore, because the approval of the three-day suspension occurred more than a month after Metivier filed her grievance, that timing, too, is too remote to permit any inference that the grievance caused the previously proposed three-day suspension to be approved.

Metivier's next protected activity occurred on February 27, 2013, when she contacted the EEO. *See* Metivier Dep. at 173. Her three-day suspension was approved just over two weeks later, on March 14, 2013. Metivier Dep. Ex. 11. By that time, the suspension had been proposed more than two months earlier, and there is no evidence that the decision-maker, Joseph Ward, who worked in an entirely different agency within the Department, was even aware of the EEO complaint when he issued his approval, much less that he acted in retaliation. Given the circumstances surrounding that suspension, no reasonable jury could find that Metivier had established a prima facie case for retaliation related to the approval of that suspension.

Metivier points to no other protected activity she engaged in after February 27, and in any event, the remaining adverse employment actions—the five-day suspension, reorganization, and RIF—are too remote in time to support an inference of causality, and she offers no other evidence tending to show causation. Because Metivier has not established a prima facie case on her retaliation claim the Government is entitled to summary judgment.

Furthermore, even if Metivier could establish a prima facie case of retaliation relating to the adverse employment actions that occurred after she made her EEO complaint on February 27, the Government has evidence of its legitimate, nondiscriminatory reasons for taking them, and Metivier has introduced no evidence of pretext. That deficiency is discussed above with respect to the reorganization and RIF. As for the five-day suspension, the Government has presented evidence that it resulted from Metivier's conduct during the June 6, 2013 phone call with Goodwin and Mentore-Smith including, according to Goodwin, Metivier hanging up in the middle of the conversation; not following an instruction relayed through Metivier's legal assistant to call Goodwin back; not responding to an email message Goodwin sent the following day about the conduct; not apologizing for or acknowledging either the failure to respond or the conduct itself; and the fact that Metivier was previously suspended for reasons including Goodwin's conclusion that Metivier had been uncooperative and discourteous to OHA's IT specialist. *See generally* Metivier Dep. Ex. 13. Metivier disagrees that her conduct on the June 6 phone call was rude, but she does not seem to dispute that she hung up on Goodwin and Mentore-Smith, did not respond to Goodwin's phone call or email shortly after that call, did not apologize

for or acknowledge the failure to respond to those attempts to contact her or for the conduct with which Goodwin obviously took issue, or that she had previously been disciplined for instances in which Goodwin believed she had acted rudely.  Moreover, Metivier has not come forward with any evidence that, however ill-founded she might believe Goodwin's characterization of the phone call to be, the characterization was merely a pretext for retaliating against Goodwin on the basis of an EEO complaint she made more than three months earlier.  For that additional reason, the Government is entitled to summary judgment on Metivier's retaliation claim.

D

Metivier contends that she suffered reprisals for reporting violations of Title VII, in violation of the Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16; Pub. L. No. 103-424, 108 Stat. 4361 (codified, as amended, in various sections of Title 5 U.S.C.), and the Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465.  *See* Am. Compl. ¶¶ 96–109; Metivier Dep. at 228 ("Q: So you're whistleblowing on what you perceive is violations of Title 7?  A: Yes, and her failure to follow the policies by not—  Q: The internal policies that implement the requirements of Title 7?  A: Yes.  Thank you.").  But Metivier's exclusive remedy for such sex-based discrimination and retaliation arises under Title VII.  *Brown v. Gen. Servs. Admin.*, 425 U.S. 820, 834–35 (1976) ("We have consistently held that a narrowly tailored employee compensation scheme pre-empts the more general tort recovery statutes, . . . [and thus §] 717 of the Civil Rights Act of 1964, as amended, provides the exclusive judicial remedy for claims of discrimination in federal employment."); *Pretlow v. Garrison*,

420 Fed. App'x 798, 801 (10th Cir. 2011) ("Insofar as [whistleblower plaintiff] complains of discrimination and associated retaliatory conduct, his exclusive remedy is provided by Title VII of the Civil Rights Act of 1964."); *cf. Premachandra v. United States*, 739 F.2d 392, 394 (8th Cir. 1984) (holding that government employee could not sue the United States under the Federal Tort Claims Act for injury suffered upon discharge because, drawing heavily on the Supreme Court's decision in *Brown v. GSA*, Congress intended the Civil Service Reform Act of 1978 to provide the exclusive remedy and to preclude relief under the FTCA). And, for the reasons described above, Metivier's other claims—all brought under Title VII as Congress intended such claims to be—cannot survive summary judgment.

## ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant David Bernhardt's motion for summary judgment [ECF No. 51] is **GRANTED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.


Dated:  October 31, 2019                              s/ Eric C. Tostrud_____
                                                      Eric C. Tostrud
                                                      United States District Court